A97A0258. BLUE CROSS & BLUE SHIELD OF GEORGIA, INC.
v. KELL et al.
(488 SE2d 735)

ANDREWS, Chief Judge.

Blue Cross & Blue Shield of Georgia, Inc. (Blue Cross) appeals from the trial court's grant of summary judgment to Dr. Kell[1] on Blue Cross' counterclaim against Dr. Kell in his original suit seeking reimbursement of claims from Blue Cross for patients treated at his clinic, The Private Clinic.

## Review of Proceedings

Kell initiated litigation against the State Merit System in October 1991, contending that he was owed $154,867 for medical services rendered to employees insured by it (Case No. D-93448). The State Merit System's insurance program is administered by Blue Cross.

In May 1992, Kell filed a separate suit against Blue Cross contending he was owed $43,158 for treatment of a specific patient[2] which had been rendered pursuant to the Participating Physician Agreement into which he and Blue Cross had entered on March 7, 1988 (Case No. E-725). Blue Cross counterclaimed in this suit that "Kell made representations to BCBS concerning the nature of the services which were provided to this patient and the nature of the charges which were made to this patient and to BCBS which [he] knew to be false at the time . . . made them and which were for the intent and purpose of deceiving BCBS and inducing BCBS to pay them. BCBS reasonably relied on these representations and suffered damage. . . ." Additionally, Blue Cross contended that Kell's actions were in violation of the Georgia Fair Business Practices Act, OCGA § 10-1-390 et seq. While the two actions were consolidated, the sum-

---

[1] Dr. Kell was sued individually and as his professional corporation, but the legal distinctions involved are not at issue here and he will be referred to only individually.

[2] Apparently, although not contained in the voluminous record before us, this allegation regarding one patient was amended to include "patients" as reflected in Kell's motion for summary judgment.

mary judgment on the fraud counterclaim is specific to Case No. E-725.

Summary judgment was granted State Merit and Blue Cross on Kell's claims for payment, because the insurance plans and provider agreements allowed State Merit and Blue Cross, its administrator, sole discretion on coverage issues. That judgment was appealed to this Court and affirmed in Case No. A94A0988.

## Fraud Claim

1. In reviewing grant or denial of summary judgment, this Court conducts a de novo review of the evidence. *Goring v. Martinez,* 224 Ga. App. 137, 138 (2) (479 SE2d 432) (1996); *Gaskins v. Hand,* 219 Ga. App. 823 (466 SE2d 688) (1996). The grant of summary judgment will be affirmed on appeal if it is right for any reason. *Deese v. NationsBank of Ga., N.A.,* 222 Ga. App. 275, 277 (1) (474 SE2d 18) (1996).

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial. [Cit.] A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." (Emphasis in original.) *Lau's Corp. v. Haskins,* 261 Ga. 491 (405 SE2d 474) (1991).

2. In order to prevail on its fraud claim against Kell, Blue Cross was required to come forward with evidence to prove that: (1) Kell made a false representation; (2) he knew the representation was false when made; (3) the representation was made to induce Blue Cross to act or refrain from acting; (4) Blue Cross justifiably relied on the representation; and (5) damages. *Fowler v. Overby,* 223 Ga. App. 803 (478 SE2d 919) (1996); *Watson v. Zurich-American Ins. Co.,* 221 Ga. App. 4, 5 (470 SE2d 684) (1996).

During discovery, Blue Cross specified additional acts which it contended constituted fraud, i.e., submitting claims for services not actually rendered or for services performed but not needed; submitting claims for "excessive amounts"; submitting claims for amounts in excess of amounts charged private non-insured patients for the same services; and intentionally prescribing methadone to patients with the intent of keeping them addicted to it with no intent to ever wean them from it.

Dr. Kell signed a Participating Physician Agreement with Blue Cross on March 7, 1988. Shortly thereafter, on May 4, 1988, he sent a four-page letter to the Medical Director of Blue Cross' claims department setting out his proposed treatment of Blue Cross subscribers for "extended and continuous physiological and psychological addiction to opiates (ICD-9-CM Code 304.1)"[3] with methadone. The letter explained his proposal for treatment and his contentions that this treatment would be more cost-effective for Blue Cross than other treatments. During this time, Dr. Kell was also discussing this reimbursement concept with Evans of Blue Cross. In addition to treating opiate addiction, the Private Clinic also treated patients for chronic pain and other illnesses.

Kell's proposal was sent to Dr. Thomas Hudson of Blue Cross Professional Affairs for review. In his July 13, 1988 internal memo to Evans, Dr. Hudson describes the potential various coverages available for such treatment, including that provided under nervous and mental benefits for the psychotherapy component, which would pay limited benefits. Laboratory testing and prescriptions for methadone "would be eligible for coverage as a legend drug under those contracts that have major medical and provide benefits for prescription drugs." This comported with Dr. Kell's understanding of how the claims should be processed and were being processed by other insurance companies.

Dr. Kell became convinced in late 1988 and thereafter that some patients suffering from opiate dependence could, in fact, be suffering from an endocrine deficiency, a physiological condition. He discussed this concept with an internist cardiologist patient of his who was being treated at The Private Clinic. Also, Dr. Kell became aware of ICD-9-DM code 259.8, endocrine disorders, which he believed "more accurately reflect[ed] the proper diagnosis of some of Private Clinic's patients."

By letter of November 24, 1988, to Woodbury, the Division Director of Health Services for State Merit, Dr. Kell explained his theory

---

[3] The International Classification of Diseases, 9th Revision, Clinical Modification, used by Blue Cross to code diagnoses for consideration of payment. The ICD-9-CM is a classification used in the private health insurance industry as well as Medicaid and Medicare.

that opiate use could cause physical damage to a portion of the user's brain, making methadone treatment compensable under major medical.

In cases he deemed appropriate, Dr. Kell began substituting code 259.8 for code 304.1 on claim forms. In most if not all cases, code 259.8 was shown as the primary diagnosis, with code 304.1 as a secondary diagnosis. He advised Blue Cross representatives, by phone and letter, of his belief regarding this coding.

While Blue Cross' computers were programmed to recognize and process for payment under nervous and mental coverage code 304.1, opiate dependence, they were not programmed to recognize code 259.8, endocrine disorder, endorphin, for drug dependency, and claims from The Private Clinic so coded were routed by the computer for payment under major medical coverage, which paid 80 percent of the charges, more than coverage under nervous and mental.

Dr. Kell treated patients and was generally reimbursed by Blue Cross until 1990 when Blue Cross began to question some claims. Although inquiries by Kell and Kulas, his office administrator, concerning the holdup in the processing of these claims were met with the response that the claims were "in review," or required that additional supporting records be submitted, in reality, Blue Cross' fraud investigator, Galler, had begun an investigation of the claims.

Galler, a high school graduate with some college credits, began working for Blue Cross in October 1989, as a research and documentation specialist, who examined claims that processors felt might have something wrong. After graduating from high school in 1983, and prior to coming with Blue Cross, Galler had worked at Wendy's, Olan Mills, Crawford Long Hospital as a patient services representative, John Harland printers, Parole Consultant Services, a private investigation firm involved in post-conviction relief for prisoners, and Goldman Investigators, specializing in domestic cases. She apprenticed as a private investigator and obtained her license in 1988.

Galler was promoted from research and documentation specialist to an investigator with fraud investigations, a unit of the Blue Cross legal department, where she worked for Williams. In March 1990, she began working on Kell claims, although she was unable to remember why these claims attracted her attention initially. She worked on one claim for C. M.[4] which she recalled used the endocrine disorder as diagnosis with methadone as treatment. While uncertain, Galler believed this claim was paid. Thereafter, she overheard Williams talking to Jim Ellis, a subscriber, about certain Kell claims

---

[4] All references to specific patients are made by initials only, since all patient information is privileged and subject to protective orders in the trial court and here.

where employees had exceeded the coverage available for nervous and mental treatment. Galler also talked to Gavin in medical review, who advised her that medical review was looking at some Kell claims.

As a result of these three events, Galler sent questionnaires to ten of Kell's patients to verify that the services billed were performed on the dates indicated. In response, Galler received three completed questionnaires from C. M., F. L., and E. L. As Galler testified, the common thread among them was that "their problem was heroin addiction, and that their diagnosis was endocrine disorder. . . . I was just curious about the connection. It just seemed funny to me. . . . [The] diagnosis of endocrine disorder didn't seem to be consistent with the treatment of the patients [i.e., methadone]. . . . I was not aware of any, you know, endocrine disorder that the people had." Galler was provided by Kell with some literature concerning heroin addicts and his theory that there might be an underlying endocrine disorder. She also acknowledged her own lack of familiarity with such disorders. She called a doctor at the Medical Board who looked at some literature and told her he was aware of such a theory and that "some people totally did not believe it, and some people thought there was some validity to it. . . ."

Although Galler never met with any of the respondents, she did speak to them on the phone. During her conversation with E. L., Galler was told by him that an unidentified secretary at The Private Clinic, in response to an inquiry about the endocrine disorder diagnosis, had told him that "oh, this is just something that Dr. Kell came up with to get the claims paid through major medical benefits." E. L. also acknowledged that he harbored personal animosity toward Dr. Kell and "would be glad to help you hit him where it hurts — in his wallet."

Around this same time, Kulas began calling Blue Cross and demanding to know why claims were not being processed. Relations deteriorated, litigation began, and, by letter of January 9, 1992, Dr. Kell's status as a PPA was terminated.

3. We focus first on Blue Cross' contention that it has presented sufficient evidence to defeat summary judgment regarding its contention that Dr. Kell's changing of the diagnosis code was done with the intent to defraud Blue Cross.

While Blue Cross is correct that circumstantial evidence may be resorted to when attempting to prove fraud, *Eberhardt v. Bennett*, 163 Ga. 796, 802 (1) (137 SE 64) (1927), because of the subtle nature of fraud, this does not detract from the requirement that, on summary judgment, evidentiary rules apply. *Strickland v. DeKalb Hosp. Auth.*, 197 Ga. App. 63, 65 (2) (a) (397 SE2d 576) (1990).

Hearsay evidence is without probative value and cannot be con-

sidered unless it is part of the res gestae. *Taylor & Mathis, Inc. v. Doyle*, 219 Ga. App. 445 (465 SE2d 484) (1995). Unfortunately for Blue Cross, most of the evidence to which it points as creating factual issues is hearsay and not part of the res gestae, creating no factual issues. *Harrison v. Golden*, 219 Ga. App. 772, 774 (2) (b) (466 SE2d 890) (1995). Primarily, it is premised on Galler's investigation. The only concrete evidence produced by Galler in support of her fraud theory is E. L.'s statement to her over the telephone repeating what some unidentified employee of Kell's allegedly said. This proves nothing because the utterer cannot be identified, located, summoned or cross-examined. Id.; *Johnston v. Grand Union Co.*, 189 Ga. App. 270, 271 (1) (375 SE2d 249) (1988). An unidentified employee's overheard statement was likewise rejected in *Johnston*.

Here, in opposition to the suppositions and conjectures of Galler, later adopted by McGhee, a Blue Cross attorney, Dr. Kell submitted his own unequivocal affidavits denying any such intent and pointing to the extensive communications between him and Blue Cross concerning his theory. " ' "In passing upon a motion for summary judgment, a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists. When uncontradicted and unimpeached evidence is produced as to the real facts, the inference disappears, and does not create a conflict in the evidence so as to require its submission to a jury." (Cit.)' [Cits.]" *Taylor & Mathis*, supra at 446 (1).

Similarly, regarding the additional allegations of fraud put forward by Blue Cross during discovery, we agree with the trial court's analysis and disposal of these contentions as meritless and adopt his order as our own.

4. Even if Blue Cross had been able to come forward with some arguably admissible evidence of malicious intent by Dr. Kell, the record does not support Blue Cross' contention that it relied upon these misrepresentations to its detriment.

We agree with the trial court that the record fails to support Blue Cross' contention that it justifiably relied on any such misrepresentations. The extensive correspondence between Kell, Blue Cross, and State Merit as to whether his methadone treatment was compensable under nervous and mental only or partly under major medical began as early as March 1988. Further, Blue Cross extensively evaluated claims using code 259.8, refused to pay some, and required reimbursement for some earlier paid.

Summary judgment was appropriate on this basis also. *Doe v. Prudential-Bache/A.G. Spanos &c.*, 222 Ga. App. 169, 176 (5) (474 SE2d 31) (1996).

5. Blue Cross' contention that this issue is controlled by the deci-

sion of a federal court in litigation between Blue Cross of Virginia and Kell cannot be considered for a number of reasons, the primary one being that the copy of that order in the record before us is not certified, as required to prove such a defense. *Bradley v. British Fitting &c.*, 221 Ga. App. 621, 622 (472 SE2d 146) (1996).

6. Finally, Blue Cross contends the trial court erred in finding that it was not a "consumer" entitled to protection of the Georgia Fair Business Practices Act. While, at the time of Kell's motion for summary judgment, it might have been arguable that Blue Cross fit the then definition of "consumer" under the Act, the legislature's 1996 amendment of the statute stating that " '[c]onsumer' means a natural person" negates any such legislative intention. Ga. L. 1996, p. 1032, § 1. This amendment is the law which we apply to this issue and controls. *Evans v. Belth*, 193 Ga. App. 757, 759 (2) (388 SE2d 914) (1989).

*Judgment affirmed. Beasley and Smith, JJ., concur.*

DECIDED JULY 11, 1997.

*McKee & Barge, Patrick W. McKee, James R. Marshall*, for appellant.

*Alston & Bird, Rebecca M. Lamberth, Kristen P. Mersereau, Bernard Taylor, Michael P. Kenny*, for appellees.