[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11329

_____

SKY HARBOR ATLANTA NORTHEAST, LLC,
CRESTLINE HOTELS & RESORTS, LLP,

Plaintiffs-Counter Defendants-Appellants-
Cross-Appellee,

*versus*

AFFILIATED FM INSURANCE COMPANY,

Defendant-Counter Claimant-Appellee-
Cross-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:17-cv-03910-JPB

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

PER CURIAM:

Plaintiffs-Appellants Sky Harbor Northeast, LLC, and Crestline Hotels & Resorts, LLC, seek coverage under an all-risk insurance policy with Affiliated FM Insurance Company ("AFM") for extensive water and mold damage discovered during a 2015 renovation to the Atlanta Hilton Northeast Hotel ("the Hotel"). AFM countersues for fraud and conspiracy, claiming that Sky Harbor and Crestline misrepresented and concealed information related to the timing of the damage to the Hotel. For the purposes of summary judgment, the parties do not dispute that it rained during the policy period, rainwater and water vapor intruded into the building, and the intrusions wet various features of the building's interior structure. The central question on appeal, then, is whether those intrusions that happened during the policy period caused any damage.

Sky Harbor and Crestline point to evidence that the intrusions wet, among other features of the Hotel, the exterior sheathing, the metal framing, the interior wallboard, electrical wiring, and the drywall, requiring complete replacement of the damaged features. Many of these features are within the interior wall cavity. So replacing them requires removing guest-room walls, interior finishings, and the building's brick veneer, and the remediation

costs run into the millions of dollars. AFM in turn argues that whatever damage the rain caused during the policy period was de minimis, because these features were already wet and moldy when Sky Harbor bought the Hotel and the policy period began.

After careful review of the record, and with the benefit of oral argument, we conclude that a reasonable jury could find for either party. But the central question—the degree of damage, if any, that the building suffered during the policy period—is one of fact. So a jury—not a judge or judges—must decide it. For this reason, we vacate the grant of summary judgment in AFM's favor on Sky Harbor and Crestline's claims for breach of contract, declaratory judgment, and bad faith, and remand to the district court for further proceedings on those claims. But we affirm the district court's conclusion that Sky Harbor is not an insured, as well as the district court's grant of summary judgment in Sky Harbor and Crestline's favor on AFM's counterclaims for fraud and civil conspiracy.

## I.    Background

### A.    The Policy

Sky Harbor purchased the Hotel on November 5, 2013. Crestline, a leading provider of hotel-management services, operated and managed the Hotel on Sky Harbor's behalf.

Crestline amended its existing all-risk insurance policy with AFM to add the Hotel to its list of insured locations, effective as of the date of Sky Harbor's purchase. For this coverage, Crestline

agreed to pay an additional annual premium.  Crestline renewed this policy with AFM in 2014 and again in 2015.  The policy language is the same across all three policy years.  So for simplicity's sake, we refer to "the Policy," even though three separate policies were issued during the time period at issue in this case.

The Policy broadly "insures against all risks of direct physical loss or damage to insured property except as excluded under this policy."  As relevant here, the Policy limits coverage concerning certain risks—Group II perils—by what is sometimes known as an "ensuing loss" or "resulting loss" clause.  That is, those perils that Group II lists are covered only to the extent that they cause "direct physical loss or damage," in which case the "resulting direct physical loss or damage is covered."  Group II perils include "1. Wear and tear, deterioration, depletion, rust, corrosion, erosion, inherent vice, latent defect" and "2. Defects in materials, faulty workmanship, faulty construction or faulty design."  So the Policy excludes coverage for correcting those defects themselves, but it covers "resulting direct physical loss or damage" from them.

The Policy contains only two perils for which resulting losses are *not* covered if the peril began before the Policy period.  It does not mention that any other peril—as opposed to the damage or loss from that peril—must have occurred during the Policy period for coverage purposes.  Specifically, the Policy provides that it

does not cover losses caused by earth movement or flood "commencing before the effective . . . date and time of this policy."[1]

Finally, the Policy defines the "Insured" as Crestline and "its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by" Crestline.

### B.        Pre-Acquisition Issues

The Hotel is ten floors with two main components. The "tower" part of the building contains 272 guest rooms. And a common space, including meeting rooms and a ballroom, comprises the low-rise portion of the building.

Before acquiring the Hotel, Sky Harbor retained multiple third-party experts to appraise and evaluate the property. Each of these experts indicated that the Hotel was in "overall good condition" as of 2013. The reports found no major defects, deficiencies, or deferred maintenance as to the building's "Substructure," "Superstructure," "Windows," "Doors/Frames," and "Roof Drainage." One report noted that, based on statements from the Hotel's then-general manager and its experts' own survey of the property, "[t]here was no evidence of window leaks or condensation," and no evidence of "microbial growth and/or water damage."

---

[1] "Flood," as the Policy defines it, does not encompass rain or water vapor, and neither party argues that this term applies to the circumstances Sky Harbor and Crestline describe in their claims.

But not every pre-purchase assessment was glowing. A 2013 Hilton-issued Product Improvement Plan ("PIP") included a line item for repairing and sealing all windows to correct air infiltration into guest rooms. During due diligence, Sky Harbor also reviewed seller-provided property-condition reports. A 2003 report mentioned mold in the first-floor ballroom. And a 2005 environmental site assessment noted that "there had been historical fungal growth problems associated with construction defects/water intrusion issues." Not only that, but the screening found mold in meeting rooms in the Hotel and water damage throughout the site (including the first-floor hallway area), but "[n]o visible fungal growth" in any of the hotel rooms.

Another report from the seller, a 2004 condition survey that construction consultants conducted, stated that the Hotel "has had wide-spread leakage and indoor moisture problems since its 1986 construction, primarily due to poor masonry flashings and caulking joint problems." The report detailed a series of evaluations and memoranda documenting leakage and moisture problems at the hotel starting as early as 1990, only four years after the Hotel's construction in 1986. The report noted that although "many . . . repair efforts" had been undertaken in the building's history, they appeared to have had "little effect." To correct these problems, the report recommended a multi-million-dollar repair to the building's "exterior envelope."

Finally, the seller had commissioned a Property Evaluation Report in February 2013, just before listing the property. That

report found the property to be in "generally below average condition" because of accumulated maintenance issues. In particular, the report pointed out "[m]ajor issues" with the exterior facade, "water infiltration into the hotel and guest rooms," and "[a]reas of suspect mold growth . . . under windows and behind the wall coverings in several of the guest rooms at the masonry facade locations." The report suggested numerous repairs to the exterior facade, roof, and guestrooms to remedy these deficiencies at extensive cost. The Hotel's former owner stated that it did not perform any of the major repairs that the report detailed before the former owner sold the Hotel to Sky Harbor in November 2013.

Sky Harbor's corporate-designee Jerome Yuan, chief investment officer at Sky Harbor's owner, ASAP Property Holdings, Inc., testified that, after reviewing the seller-provided reports and the new appraisals we've described above, he "didn't think that there was a mold problem or any cause of mold at the hotel" because the more recent appraisals did not mention mold, and he did not see mold himself when he personally inspected the property. Jerome Yuan had toured and inspected the Hotel in 2013, specifically viewing the ballroom, and he saw no evidence of the problems that the 2003 report mentioned. And he believed that the seller had fixed any mold or water intrusion problems that the 2003 report identified, particularly after reviewing the seller's maintenance and improvement records.

During its pre-purchase due diligence, Sky Harbor also became aware of a few active "spot" mold problems in approximately

twenty or twenty-five of the 272 guest rooms, isolated on one side of the guestroom tower at the Hotel. The Hotel's then-property manager thought the mold was "due to moisture seepage through the exterior brick facade." Sky Harbor and Crestline claim these issues were not particularly severe and were consistent with regular maintenance issues in a facility of that size. They also assert that the seller was responsible for remediating the mold identified in the guest rooms before the sale. According to Sky Harbor and Crestline, the seller confirmed that it would complete these remediations before closing, and Crestline and Jerome Yuan viewed and verified the completed work. As one Crestline employee testified, "we were told that the mold was remediated by the seller, that we took over a clean hotel."

Before issuing the Policy, AFM also performed its own inspections of the Hotel. As Brian Cook, Vice President of AFM's Special Investigations Unit, testified, before insuring a property, AFM inspects it to determine whether it is a good or bad risk, and AFM discusses any "deficiencies" with the insured. Here, in 2010, three years before Sky Harbor bought the Hotel, AFM conducted a risk evaluation of the Hotel and insured it under its previous ownership. The evaluation mostly mentioned issues and risks related to fire safety, but it did not identify any mold, water damage, or water intrusion problems.

### C.    Post-Acquisition Issues

Once they were operating the Hotel, Sky Harbor and Crestline became aware of some mold and leak issues. Again, they

characterize these as "regular maintenance" issues.  For example, Frank Yuan, Sky Harbor corporate designee and ASAP Property CEO, testified that monthly reports by Hotel managers would sometimes indicate that there was a faucet or toilet leak, or a spot of mold in one room, and that they had taken care of it.  Based on his experience with hotels, Frank Yuan knew that there would always be "some mold" in a large hotel in a warmer climate, but nothing remotely of the "magnitude" later discovered at the Hotel during the 2015 renovation.

Marcy Adams, the Hotel's General Manager, likewise testified that she didn't know of any systemic problems with the Hotel, such as mold or water damage, before the 2015 renovation.  To the extent that there had been occasional reports of mold before the renovation, management had been able to resolve these "sporadic" problems and identify and fix the "case-by-case" causes, such as pinhole leaks in pipes or a toilet overflow.

AFM disagrees, suggesting that mold and water-intrusion issues were systemic and apparent at the Hotel throughout 2014 and early 2015.  They point out that on August 1, 2014, Sky Harbor and Crestline met to discuss, according to the meeting agenda, "[s]ignificant concerns about existing conditions at the property" requiring "significant repairs to window seals and dry rot under bathtubs."  Crestline's PowerPoint for the meeting included several guest reviews that called attention to mold and water damage in guest rooms, particularly in the bathrooms, in addition to a section on pictures of mold found in the guest rooms.  According to one

of the Crestline employees who worked on the PowerPoint, "the mold was evident throughout the building . . . it was not just a very isolated area or a room or two . . . ."

Later that month, on August 25, 2014, Sky Harbor's project manager for the Hotel renovation advised Sky Harbor that "ALL windows will need new seals or caulking treatment to stem water infiltration." And a few months later, in December 2014, "severe mold" was reported during work in the two model rooms at the Hotel.

Problems continued into 2015. In January 2015, Sky Harbor asked a consultant, Finite Reimaging, to investigate its water intrusion problems before its planned renovation. While testing two guestrooms in February 2015, Finite reported "excessive amounts of mold" in both rooms. The mold became visible only when Finite removed the wallpaper. Finite noted that defects with the brick and grout lines, caulking, and window seals allowed water to leak into the Hotel. These water leaks caused damage to dry wall adjacent to windows, created noticeable water staining in corridors, and allowed "significant amounts of mold" to grow in the two guest rooms examined.

AFM claims that it did not learn about any of the pre-existing water-intrusion or mold issues with the Hotel until litigation. In other words, AFM claims it did not know about the pre-purchase seller reports and assessments, the pre-purchase mold problems in the guest rooms, and the spot issues reported throughout 2014 and 2015 until this case, when Sky Harbor and Crestline provided them.

### D.    The 2015 Renovation

In September 2015, Sky Harbor and Crestline began renovating the Hotel.  During this process, they discovered extensive mold behind the wallpaper in the guest rooms on the ninth and tenth floors.  They also learned of roof, plumbing, cladding, and window leaks that appeared to have caused the mold and water damage to the Hotel.

Plaintiffs retained third party Liberty Building Forensics Group ("Liberty") to investigate the causes and extent of the water leaks and mold.  Liberty prepared a thirty-one-page "Revised Water Damage Report."  It details the water damage the Hotel sustained "during recent rainwater events," including significant storms in August 2015.  Liberty directly observed "water intrusion through the building envelope" and water vapor intrusion during its onsite investigation and testing, including during rain events in October and November 2015.  Similarly, Sky Harbor representative Frank Yuan saw "water pouring down from the roof" to the first floor "like water fountains" in October 2015.

Summarizing its investigation, Liberty surmised that recent "rainwater leaks," including rain events on August 22 and 23, 2015, and rain events observed during testing on October 28, 2015, and November 1 and 2, 2015, caused water damage in the Hotel.  Ultimately, Liberty concluded that during these rain events, water leaked "through the no-hub type connections" in the rainwater drainage system, "the brick facade, glazing systems, [and the] vertical wall waterproofing and flashing system."  Through these

leaks, the rainwater directly wet the framing system, the exterior sheathing, roof insulation, wall cavity insulation, the wallboards, the electrical and data service conduit systems inside the wall cavity, the drywall, and the interior wall finishings. Water vapor intrusions also occurred through cracks in the brick and glazing facade "over the cooling season during July 2015," resulting in water vapor damage to the adjacent wallboard, insulation, and framing systems. Finally, Liberty discovered a malfunction in the building's HVAC system, which exacerbated the damage from the water leaks and caused excess condensation. This excess condensation and water vapor damaged "the gypsum wallboard, insulation[,] metal framing," and adjacent ductwork and piping.

Liberty also included estimates of how much water and water vapor entered through various leaks, using testing and the August rain events as examples. According to Liberty, the water and water-vapor damage that the leaks caused "necessitate[] the removal and replacement of damaged items" and "controlled remediation techniques" to address the growing mold—a fix that requires the expenditure of tens of millions of dollars.

But the Liberty report left a key question open: did these leaky, wet, and moldy conditions begin after Sky Harbor purchased the Hotel, or did any of the discovered damage pre-date the Policy period? In his deposition, Liberty's president testified that the conditions "could [have] occurred" earlier in time, such as in the summer of 2012. After all, buildings like the Hotel "go[] through . . . cycles" where they get wet in the summertime and dry in the

wintertime, so one "could expect" that the building had been previously wetted and then dried through "the same mechanism."

But Liberty's president made two important clarifications to this testimony. First, he clarified that such annual damage would have been cumulative: each summer wet the interior "at least as much as it wetted the previous cooling season . . . . But as you move from cooling season to cooling season, the damage is more the next cooling season than the prior cooling season if it's under the same condition." So by Liberty's reasoning, even if such conditions occurred before 2013, the most recent years that the conditions existed likely produced more damage than any previous year.

Second, he stated that all the damage in the report "could have occurred" in 2015 alone, and that the report's damages estimates were based on measures of water leakage and water vapor intrusions from the 2015 summer. For example, Liberty's president testified that in Liberty's expert opinion, the storm event in August 2015 alone caused almost $5 million dollars in damages. Liberty specifically estimated the volume of water that flowed through roof drains and onto the exterior sheathing during the two-day storm in August 2015. And in Liberty's expert opinion, the 22 gallons of water intrusions from the two-day storm wet the exterior sheathing to the point it required replacement. By Liberty's calculations, replacement would cost almost $5 million because it involved pulling the exterior cladding off as well. AFM appears to agree that the report "suggest[s] that an August 2015 rainwater event caused all of the claimed damage."

### E.    The Claim and Investigation

Crestline's insurance broker notified AFM of Crestline and Sky Harbor's claim on September 21, 2015. AFM promptly acknowledged the claim and began an investigation, sending out an adjuster and a consultant from Engineered Solutions Incorporated ("ESI") to the Hotel the very next day. During this visit, AFM requested any images, reports, or correspondence about mold or related issues at the property.

The next month, in October 2015, AFM sent Adams, the Hotel's General Manager, several emails stating that its investigation was ongoing, as it was "trying to determine the source of water and or moisture which led to the discovered mold growth." The adjuster asked for more information about the mold and related issues "to help us determine when the mold might have started."

In addition, the adjuster sent a report from ESI, based on a visual examination of the ninth and tenth floors of the Hotel only. ESI determined that "[d]uring rain events, water has recurrently entered the cavity between the brick veneer and presumed building-paper covered wall sheathing . . . . creating an environment conducive to mold and mildew growth within the wall." The report also appeared to attribute the mold growth to long-standing issues, such as leakage in the exterior wall, plumbing leaks in the interior walls, and recurring condensation in the interior walls that occurred "over the life of the building." In response to these emails, Sky Harbor and Crestline asked AFM to wait for additional

information, including the Liberty report, before making a final coverage determination.

The record reflects that during this period, Sky Harbor and Crestline appeared to have had some doubt about whether the Policy covered the damage. As a representative of one of Sky Harbor's shareholders said in an email, "If the intent is to try to force the insurance company to cover the repairs due to mold, what's the mold clause in the policy[?] . . . . [T]he mold is not a new issue. It has been a known entity to the property for years."

Because of doubts about coverage, Crestline and Sky Harbor internally expressed that "[L]iberty [should] focus[] on only the building problems that are 'compensable' from an insurance standpoint" in its report. But when Sky Harbor and Crestline received Liberty's initial report, they expressed disappointment that it "had provided a series of deficiencies that the insurance company[ ] would have used in a way to create an extraordinary amount of deductibles that would apply to our claim. This of course defeats the purpose of maximizing our claim amount." The initial causation report as to the building's water damage discusses "leaks observed during rains" as one of its main observations, but the language in its conclusions and summaries refers to water damage from leaks generally, rather than rain or specific rain events like the August 2015 storms. Because of these deficiencies, Sky Harbor and Crestline's attorneys hoped to "work with Liberty to get rid of their analysis that the insurance company would claim would require a

ridiculous number of [deductibles]" in the report. Sky Harbor and Crestline did not give AFM Liberty's initial reports until litigation.

Plaintiffs submitted identical Proofs of Loss in 2016. In the Proofs of Loss, Plaintiffs swore that mold and water damage was discovered in September 2015 when the renovation work began. The revised Liberty report also specifically refers to "*rainwater leaks*" as a cause of the water and mold damage. The Proofs of Loss claimed over $20 million in damages, including mold and water damage to guestroom drywall and electrical wiring damage.

In response to these Proofs of Loss, AFM repeatedly indicated that it needed "further information" to determine coverage, including "the time and origin of the loss and/or losses and damage sustained." We understand AFM's demands to ask Sky Harbor and Crestline to parse what degree of mold damage resulted from each water intrusion, and the dates and times of those intrusions.

In response to one of these requests for further information, Sky Harbor represented to AFM that it did not observe evidence of mold problems in the Hotel during the due-diligence period before purchase in 2013, and it did not discover the extensive mold damage at the Hotel until September 2015. It also represented that the revised Liberty report contained the information currently available to Sky Harbor regarding the dates, times, origin, and scope of the losses. Throughout Spring 2016, AFM continued to request more information and conducted multiple site visits to the Hotel as additional floors were renovated and became available for inspection.

On May 20, 2016, AFM rejected the Proofs of Loss. Despite denying the Proofs of Loss, AFM continued to investigate, conducting visits to the Hotel in June and July of 2016.

In late June 2016, AFM informed Plaintiffs that it was exercising its right to take examinations under oath and to examine pertinent documents. AFM conducted these examinations in Fall 2016. And in August 2016, Sky Harbor produced thirty-seven thousand pages of documents to AFM, representing that the production completed the turnover of "all responsive documents" to AFM's requests for information so that "there [wa]s no further reason for [AFM] to use allegations of lack of documentation as an excuse for its failure to complete its investigation and pay this claim." AFM confirmed its denial of coverage by letter dated January 6, 2017. It said that (1) no specific event had caused the losses, (2) that most of the losses were excluded under the Policy, and (3) that the losses had developed over time and "began well before" the effective date of the Policy.

The next month, in September 2017, Sky Harbor and Crestline filed suit against AFM for breach of contract, bad faith, and a declaratory judgment that AFM is obligated to pay their insurance claim. During his deposition, Frank Yuan also admitted that Sky Harbor was "exploring the possibility" of suing other parties, including the original seller of the building because the mold "really happened before we purchased." AFM countersued, asserting fraud and civil conspiracy.

In April 2019, during litigation, Sky Harbor and Crestline amended their Proofs of Loss. They adjusted estimates for some damages and forwent recovery on other categories of damages. The net effect reduced the overall claim amount by roughly $7 million. Some months later, during some of the November 2019 depositions taken, various Sky Harbor and Crestline representatives mentioned that Plaintiffs might amend their Proofs of Loss again, but Sky Harbor and Crestline never filed any new Proof of Loss or amended damages with the court.

After the parties moved for summary judgment, the district court awarded summary judgment in AFM's favor on all Sky Harbor and Crestline's claims. *Sky Harbor Atlanta Ne., LLC v. Affiliated FM Ins. Co.*, 676 F. Supp. 3d 1302, 1312 (N.D. Ga. 2021). The court held that the Policy did not cover Sky Harbor and Crestline's insurance claim because, as a result of defects that existed since the Hotel's construction, the losses began before to the Policy period. *Id.* at 1308–09. Because "no change [had occurred] to the Hotel resulting from an external event that transformed the property from satisfactory condition to unsatisfactory condition," the court reasoned that Sky Harbor and Crestline lacked coverage. *Id.* at 1308. And because the court found no coverage, there could be no finding of bad faith. *Id.* at 1309. The district court also awarded summary judgment in Sky Harbor and Crestline's favor on AFM's counterclaims. *Id.* at 1310. Plaintiffs and AFM appealed.

## II.    Standards of Review

We review *de novo* a district court's grant of summary judgment. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010). We apply the same legal standards as the district court. *Id.* After construing the evidence in the light most favorable to the non-moving party, we will affirm if we find no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 1263–64; FED. R. CIV. P. 56(a). The moving party bears the burden of showing that no genuine issues of material fact exist. *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1121–22 (11th Cir. 2014). But once the moving party satisfies that burden, the burden shifts to the nonmoving party to point to evidence demonstrating a genuine issue for trial. *Id.* Overcoming summary judgment requires more than speculation or a mere scintilla of evidence. *Id.* at 1122. We may affirm summary judgment on any ground the record supports. *Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1277 (11th Cir. 2001).

## III.    Discussion

### A.    *Breach of Contract and Declaratory Judgment*

We begin with the district court's grant of summary judgment in AFM's favor on Sky Harbor and Crestline's claims for breach of contract and declaratory judgment. Because we conclude that Sky Harbor and Crestline pointed to sufficient evidence that the Policy covers their claims, we vacate the district court's grant of summary judgment.

20                          Opinion of the Court                          21-11329

Under Georgia law,[2] an insurance policy is a contract subject to the ordinary rules of construction. *Am. Strategic Ins. Corp. v. Helm*, 759 S.E.2d 563, 565 (Ga. Ct. App. 2014). If the policy language is clear and unambiguous, we must enforce it according to its plain terms. *Id.* When a policy does not define terms, we may look to dictionaries to elucidate the commonly accepted meaning of the word. *See Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 707 S.E.2d 369, 371 (Ga. 2011). But when a policy's language is ambiguous and supports more than one reasonable interpretation, we strictly construe it against the insurer and in favor of the insured and coverage. *Am. S. Ins. Co. v. Golden*, 373 S.E.2d 652, 653 (Ga. Ct. App. 1988).

We also consider the policy as a whole. That means we give effect to each provision in a way that harmonizes it with each other. *S. Tr. Ins. Co. v. Dr. T's Nature Prods. Co.*, 584 S.E.2d 34, 35–36 (Ga. Ct. App. 2003).

Finally, the plaintiff bears the burden to prove that it sustained a covered loss. *Chix v. Ga. Farm Bureau Ins. Co.*, 258 S.E.2d 208, 209 (Ga. Ct. App. 1979). We start with the text of the Policy itself. AFM's Policy broadly "insures against all risks of direct physical loss or damage to insured property except as excluded under this policy." We consider the term "risk" first. Black's Law Dictionary defines "risk" as "[t]he uncertainty of a result, happening, or

---

[2] Because the parties did not litigate choice of law in this diversity case, we presume that the substantive law of the forum, Georgia, controls. *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989).

loss; the chance of injury, damage, or loss." *Risk*, BLACK'S LAW DICTIONARY (12th ed. 2024). In the context of insurance, a risk is "[t]he cause of a potential or actual loss; a peril from a specified source." *Id.* So courts interpret an insurance policy like the one at issue here to insure against all uncertain damage or loss, "caused by or the result of a peril not otherwise excluded." *AFLAC Inc. v. Chubb & Sons, Inc.*, 581 S.E.2d 317, 318 (Ga. Ct. App. 2003); *see Lipsitz v. Fireman's Fund Ins. Co. of Ga.*, 358 S.E.2d 624, 625 (Ga. Ct. App. 1987).

Another key phrase regarding coverage is "direct physical loss or damage to." The Court of Appeals of Georgia has adopted an analysis for this phrase, so we start there. *McMahan v. Toto*, 311 F.3d 1077, 1080 (11th Cir. 2002) ("[A]bsent a decision from the state supreme court on an issue of state law, we are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently.").

In *AFLAC Inc. v. Chubb & Sons, Inc.*, the Georgia Court of Appeals interpreted a nearly identical phrase—"direct physical loss of, or damage to"—while reviewing an all-risk insurance policy. 581 S.E.2d at 318. Based on the "common meaning of the words and the policies as a whole," it held that the phrase "'direct physical loss or damage' . . . contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it

so." *Id.* at 319. So under Georgia law, "direct physical loss or damage" in an all-risk policy requires (1) a tangible change to property (2) caused by an accident or other fortuitous event. *Id.*; *see also Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, 35 F.4th 1318, 1320–21 (11th Cir. 2022) (adopting the same analysis from *AFLAC*).

*AFLAC* defined "accident or fortuitous event" as "an event which happens by chance, unexpectedly, or without known cause; one which is undesigned or unplanned." *AFLAC Inc.*, 581 S.E.2d at 319 n.5 (emphasis omitted); *see also fortuitous event*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("An event that, so far as contracting parties are aware, depends on chance."). So when we consider "risk" and "direct physical loss or damage" together, the Policy covers any physical change to the property that an unexpected event causes, unless the Policy explicitly excludes the causing peril.

Of course, this language also implicitly requires the damage to have happened during the Policy period, not before or after. After all, there is no "risk[] of" direct physical loss or damage to property if that damage has already certainly occurred. And the insured property cannot be considered "changed" if it was insured in the same condition—"change" is a relative term. *See AFLAC Inc.*, 581 S.E.2d at 319 (stating that the terms of an identical all-risk policy contemplate "an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use"). The same goes for the fortuitous event causing the

damage—it cannot be an accident or an unforeseen event if it has already happened.

Indeed, we have interpreted all-risk policies this way for decades. *See Mathis v. Hanover Ins. Co.*, 192 S.E.2d 510, 511 (Ga. Ct. App. 1972) (stating that all-risk insurance covers "only extraordinary and fortuitous events"); *Banco Nacional De Nicaragua v. Argonaut Ins. Co.*, 681 F.2d 1337, 1340 (11th Cir. 1982) (under the law of the former Fifth Circuit, stating "[t]he plaintiff in a suit under an all-risks insurance policy must show a relevant loss in order to invoke the policy, *and proof that the loss occurred within the policy period* is part and parcel of that showing of a loss" (emphasis added)). To read the Policy in any other way would allow insureds to claim damages that occurred before or after the policy period, rendering the policy start and end dates virtually meaningless. And as a general rule, "we 'avoid any construction that renders portions of the contract language meaningless.'" *Cincinnati Ins. Co. v. Magnolia Ests., Inc.*, 648 S.E.2d 498, 500 (Ga. Ct. App. 2007) (quoting *RLI Ins. Co. v. Highlands on Ponce, LLC*, 635 S.E.2d 168, 172 (Ga. Ct. App. 2006)).

Now that we have defined the terms in the insurance policy, we apply them to Plaintiffs' claims. AFM argues that Plaintiffs have no claims because Plaintiffs withdrew their initial Proofs of Loss when they filed their Amended Initial Disclosures in April 2019. Then, AFM contends, Crestline and Sky Harbor withdrew their amended claims just before discovery.

We don't read the record that same way, though. In April 2019, Sky Harbor and Crestline did amend their damages

calculations to reflect actual costs incurred. But they did not withdraw the entire Proofs of Loss they initially submitted.

The Amended Initial Disclosures also make clear that Sky Harbor and Crestline maintained their claims for damages. And the cited deposition testimony suggested only that Sky Harbor and Crestline might amend their claims again to reflect actual costs incurred. At no point did any Sky Harbor or Crestline representative state that Sky Harbor and Crestline wished to "withdraw" their existing claims. And no other amendments or changes were made. So the damages as stated in the initial Proofs of Loss and as amended in the Amended Initial Disclosures stand on appeal.

Accordingly, we turn to those two documents to determine whether Sky Harbor and Crestline's claims are covered under the terms of the Policy. We conclude that Sky Harbor and Crestline have pointed to evidence of some covered claims. We consider each of the elements described in *AFLAC*—(1) a tangible change to the property (2) caused by a fortuitous event—in turn.

*First*, we look for a tangible change to the property that occurred during the Policy period. Throughout their Proofs of Loss, Sky Harbor and Crestline point generally to various rainstorms during the summer and fall of 2015 that led to water and water-vapor intrusions in the Hotel, and specifically to a two-day rain event in August 2015. Sky Harbor representative Frank Yuan, who saw "water pouring down from the roof" to the first floor "like water fountains" in October 2015, observed these intrusions. According to Sky Harbor and Crestline, these intrusions wet various

features of the building to the point that they required repair or replacement.

For example, during rain events in 2015, Sky Harbor and Crestline say, rainwater leaked through the exterior cladding, causing water damage to the exterior sheathing, metal framing, interior gypsum wallboard, and the wall insulation.  Accessing and replacing the exterior sheathing requires removing the brick veneer.  Because of the difficult repair process, Liberty estimated the cost of remediating the damage from the cladding leaks at about $7.5 million.

Sky Harbor and Crestline also assert that water-vapor intrusions through the brick glazing and cladding systems, rainwater intrusions through the roof, and rainwater intrusions through the rain leader pipe likewise worked in concert to cause water damage to the wallboard, wall finishes, and electrical systems.  Liberty recommended removal of the damaged materials.  The total cost incurred for remediating this water damage was about $1.5 million.

Sky Harbor and Crestline contend that excess water-vapor condensation caused by the malfunctioning HVAC system and the rainwater intrusions also damaged the fan coil units.  The actual cost to clean the fan coil units was about $56,000.  These damages do not include the cost of remediating the mold growth that resulted from the various water and water-vapor intrusions.

AFM and the district court characterize the damage that the Proofs of Loss list as having occurred pre-Policy.  But construing the evidence in the light most favorable to Plaintiffs, a reasonable

jury could conclude that at least some of the damage happened during the Policy period.  Plaintiffs have presented some evidence that they inherited a Hotel in good condition, with pre-existing mold and water damage remediated pre-purchase by the seller. And even if a jury believed that some portion of the damage discovered pre-dated the Policy period, that does not necessarily preclude coverage under the Policy.  As long as some covered damages occurred during the Policy period, Plaintiffs' claims survive summary judgment.

As Liberty's president stated during his deposition, water and water-vapor damage have a cumulative effect, with each successive wet season or storm causing greater damage than the previous.  So the years that the Policy covered would have been the most-damage-inflicting yet in the Hotel's thirty-year history.  Not only that, but Sky Harbor and Crestline provided evidence that 2015 was a particularly bad year for water damage—water was observed running down the entire height of the Hotel, a type of damage that previous reports did not mention—and the broken HVAC system compounded the effects of the water intrusions.  So a reasonable jury could conclude that at least some of the resulting damage discovered during the renovations occurred during the Policy period.

In concluding otherwise, the district court appeared to reason that Sky Harbor and Crestline had to show that the underlying construction defects, from which the damages resulted, occurred during the Policy period, too.  *Sky Harbor Atlanta Ne., LLC*, 676 F.

Supp. 3d at 1308. The district court found that "there was no actual change to the condition of the Hotel which was occasioned by an accident, external or other fortuitous event" because "[t]he undisputed evidence shows that the origin of the water intrusion was the result of defects existing since the original construction of the Hotel." *Id*. In so reasoning, the district court considered only the dates that the construction defects, such as those in the building's envelope and exterior cladding, originated. It did not account for whether Sky Harbor and Crestline had shown any other physical change that had occurred during the Policy period—such as the damage to the wallboards, framing systems, and exterior sheathing Sky Harbor and Crestline claim resulted from water intrusions from rain events in 2015.

In short, under the Policy language, the analysis must focus on tangible change, and here, Sky Harbor and Crestline assert the tangible change is the damage, not the defect. So emphasis on the date and origin of the construction defects is misplaced.

We also note that the Policy covers damages that result from construction defects that pre-date the Policy period. Under Group II perils, the Policy does not insure "against loss or damage caused by" a list of circumstances, including "1. Wear and tear, deterioration, depletion, rust, corrosion, erosion, inherent vice, latent defect" and "2. Defects in materials, faulty workmanship, faulty construction or faulty design." But "if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered."

*Black's Law Dictionary* defines "result" as "[a] consequence, effect, or conclusion" as a noun, or "[t]o be a physical, logical, or legal consequence; to proceed as an outcome or conclusion" as a verb. *Result*, BLACK'S LAW DICTIONARY (12th ed. 2024). So the Policy plainly does not insure against defects or faulty construction itself.

But the Policy does cover "resulting direct physical loss or damage," that is, a tangible change in the property caused by a fortuitous event, resulting from the underlying defect. In other words, the resulting physical damage (or consequences or effects) of a construction defect are covered, even if the Policy will not cover the cost of repairing the defect itself.

What's more, the construction defect need not have occurred during the Policy period for its effects to be covered. The Policy contains only two perils or conditions for which losses resulting from construction defects are not covered if the peril or condition began before the Policy period. Specifically, the Policy provides that it does not cover earth movement or flood "commencing before the effective . . . date and time of this policy."

No other perils mention that the condition causing loss must have occurred during the Policy period for coverage purposes. And we must read the inclusion of language in one section of a policy and its exclusion in another to be a considered choice. *Macon Auto Auction, Inc. v. Ga. Cas. & Sur. Co.*, 121 S.E.2d 400, 404 (Ga. Ct. App. 1961). At bottom, then, while the construction defect need not have occurred during the Policy period, a tangible change

resulting from the construction defect must occur during the Policy period.

In this case, Sky Harbor and Crestline point to enough evidence to create a material issue of fact about whether that occurred. Their evidence suggests that a tangible change in the property—including the damage to the exterior sheathing, metal framing, interior gypsum wallboard, the wall insulation, the fan coil units, the wall finishes, and electrical systems—occurred during the Policy period, even though the construction defects from which they resulted originated before the Policy period.

*Second*, we look for an accident or fortuitous event, considering whether the event was, "so far as the contracting parties [were] aware," dependent on chance. *Fortuitous event*, BLACK'S LAW DICTIONARY (12th ed. 2024). A reasonable jury could find that the water intrusions caused by the rain events were unexpected, from Sky Harbor and Crestline's perspective. Plaintiffs presented evidence that though they were aware of some leakage issues before the 2015 rain events, they knew nothing of the severe defects in the Hotel's envelope and cladding that could cause significant water intrusions. So while rain is an expected occurrence, excessive water and water-vapor intrusions from rain are not. AFM may debate exactly how much Sky Harbor and Crestline knew and when. But that is an issue for a jury, and it defeats summary judgment.

For these reasons, we vacate the grant of summary judgment on Sky Harbor and Crestline's breach-of-contract and declaratory-judgment claims.

In remanding, we note that AFM raises several additional defenses to coverage, including various exclusions and limits to coverage that it claims apply and conditions precedents that it says Sky Harbor and Crestline failed to satisfy and that the district court has not yet had reason to address. We leave these defenses to the district court to consider in the first instance.

### B.    Bad Faith

We also vacate the grant of summary judgment in AFM's favor on Sky Harbor and Crestline's bad-faith claim.

Under O.C.G.A. § 33-4-6(a), if an insurer refuses in bad faith to pay a covered loss "within 60 days after a demand has been made by the holder of the policy," the insurer is liable to pay the insured extra damages and all reasonable attorney's fees. Courts in Georgia have interpreted the statute as requiring the insured to prove three elements: (1) the policy covered the claim, (2) the insurer refused to pay the claim within 60 days of a demand being made by the holder of the policy,[3] and (3) the insurer's failure to pay was

---

[3] Despite some variation in the phrasing of this element in the case law, Georgia courts routinely interpret the second element of a bad-faith claim as requiring that the insured demanded payment from the insurer "at least 60 days prior to filing suit." *E.g.*, *Thompson v. Homesite Ins. Co. of Ga.*, 812 S.E.2d 541, 544 (Ga. Ct. App. 2018); *Cagle v. State Farm Fire & Cas. Co.*, 512 S.E.2d 717, 718 (Ga. Ct. App.1999) (stating that this interpretation is "well-settled" under Georgia law); *Blue Cross & Blue Shield of Ga./Atlanta, Inc. v. Merrell*, 316 S.E.2d 548, 548–49 (Ga. Ct. App. 1984) ("It has been held that a failure to *wait at least 60 days* between making demand and filing suit constitutes an absolute bar to recovery of a bad-faith penalty and attorney fees under this statute." (emphasis added)). A 2007 Georgia Court of Appeals case misstated the element as

21-11329                    Opinion of the Court                    31

motivated by bad faith.  *Thompson v. Homesite Ins. Co. of Ga.*, 812 S.E.2d 541, 544 (Ga. Ct. App. 2018).  The district court found that Sky Harbor and Crestline could not satisfy the first element, because it found no coverage.  *Sky Harbor Atlanta Ne., LLC*, 676 F. Supp. 3d at 1309.  But as we've explained, we conclude that Sky Harbor and Crestline point to sufficient evidence to show that at least some of their claims may be covered, so the first element is satisfied.  Because we reverse on the only element discussed by the district court, we remand the case to the district court for consideration of the other elements.

---

requiring "that a demand for payment was made against the insurer *within* 60 days *prior* to filing suit," seemingly confusing the insurer's statutory deadline to pay ("within 60 days after a demand") with a time limitation on the insured's ability to sue.  *BayRock Mortg. Corp. v. Chi. Title Ins. Co.*, 648 S.E.2d 433, 435 (Ga. Ct. App. 2007).  But the Georgia Court of Appeals did not apply its misstated rule, instead finding that the plaintiff's demand was untimely because it was made while the insurer still had time left under the policy's terms to investigate the claims.  *Id.*  While this misstated rule has been cited many times by Georgia courts and courts in this Circuit, we cannot find any cases in either jurisdiction that have actually applied the misstated time limitations or interpreted *BayRock* as changing the second element of a bad-faith claim.  *See, e.g.*, *Thompson*, 812 S.E.2d at 544 (citing *BayRock* for the requirement that "a demand for payment was made by the insured *at least* 60 days *prior* to filing suit" (emphasis added)); *Balboa Life & Cas., LLC v. Home Builders Fin., Inc.*, 697 S.E.2d 240, 244 (Ga. Ct. App. 2010) (citing *BayRock* for the requirement that "after the insured demanded payment, the insurer refused to pay the covered loss for more than 60 days prior to suit being filed"); *Cox Enters., Inc. v. Hiscox Ins. Co.*, 478 F. Supp. 3d 1335, 1346 (N.D. Ga. 2020) (citing the misstated rule language, but nonetheless finding that plaintiff had stated a claim for bad faith when it alleged that "a demand for payment was made *more than* 60 days prior to filing the complaint" (emphasis added)).

### C.    Insureds

While not an independent claim,[4] Sky Harbor and Crestline argue that Sky Harbor qualifies as an insured under the definition in the Policy. Regardless, they claim that this issue is "ultimately academic" because Crestline is undisputedly a named insured, so Crestline can recover whatever payments AFM owes under the Policy.[5] Sky Harbor and Crestline have not shown that Sky Harbor is

---

[4] In the district court, Sky Harbor and Crestline brought a claim for reformation, arguing that it was a mutual mistake that Sky Harbor was not listed as an additional insured under the Policy. *Sky Harbor Atlanta Ne., LLC*, 676 F. Supp. 3d at 1309. The district court found that Sky Harbor and Crestline had abandoned this claim when they failed to respond to the arguments regarding the claim in AFM's motion for summary judgment. *Id.* at 1309–10. But Sky Harbor and Crestline also separately argued, as they do now on appeal, that Sky Harbor is already an insured based on the existing language in the Policy. *Id.* at 1310.

[5] In a footnote in its response brief, AFM contends that despite being named in the Policy, Crestline is not entitled to recover the damages asserted because Crestline admitted it expended no funds to repair the property, and Crestline does not make a claim for any diminution in its management fees. But the parties do not dispute that Crestline is a named insured under the Policy. Under Georgia law, then, the Policy dictates the amount recoverable, assuming Crestline's policy was properly taken out on an insurable interest. *Ga. Farm Bureaus Mut. Ins. Co. v. Franks*, 739 S.E.2d 427, 431 (Ga. Ct. App. 2013) ("[O]nce such an insurable interest is shown to exist, it is the policy at issue . . . that determines the amount the insured is entitled to recover."). And under the Policy, Crestline can recover for specified damage to the Hotel. So Crestline's expenditures do not affect its ability to recover under Georgia insurance law generally or the Policy specifically. *See Am. Ins. Co. v. Bateman*, 186 S.E.2d 547, 549 (Ga. Ct. App. 1971) (finding that it was "completely irrelevant" to the claim of insureds that they had no financial liability to their hired construction

an insured under the Policy language, so we affirm the district court on this issue.

The Policy defines an "Insured" as Crestline and "its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by" Crestline. Sky Harbor and Crestline argued in the district court, as they do here, that as Hotel management, Crestline controlled or operated Sky Harbor's interest, the Hotel. So in Plaintiffs' view, Sky Harbor qualifies as a named subsidiary. The district court disagreed, finding no evidence that "Plaintiff Crestline owns, controls or operates Plaintiff Sky Harbor." *Sky Harbor Atlanta Ne., LLC*, 676 F. Supp. 3d at 1310.

We agree with the district court. The Policy says that an "Insured" is "any interest . . . owned, controlled or operated by" Crestline. So even assuming that Crestline controls or operates the Hotel, and the Hotel is an "interest" belonging to Sky Harbor, Sky Harbor and Crestline still have not shown that Crestline operated or controlled Sky Harbor (as opposed to the Hotel). As AFM and the district court pointed out, even if we were to swap "interest" for "Sky Harbor" in the Policy, Crestline has not shown that it controls or operates Sky Harbor itself.[6]

---

company when an insured structure burned down mid-construction, because they still had an insurable interest in the property to be built).

[6] Sky Harbor and Crestline's comparison to *Warehouse Investors, LLC v. Affiliated FM Insurance Co.*, No. 421CV00174JAJHCA, 2021 WL 6752241, at *6 (S.D. Iowa Aug. 23, 2021) is inapposite. In that case, at the motion-to-dismiss stage,

Indeed, interpreting the Policy the way that Sky Harbor and Crestline suggest would make *any* hotel owner with which Crestline does business an insured on the Policy. Crestline, "a leading provider of hotel management services," presumably operates and controls other hotels on behalf of other owners. Under Sky Harbor and Crestline's reading of the Policy, we should equate the property interest controlled and operated by Crestline with the company that owns the hotel. If we did that, any ownership company that works with Crestline would be an insured under this Policy, whether its property was listed on the Policy or not. After all, the Policy does not limit the "interest" in the definition of insured to an interest relating to a property insured under the same policy. And there is no evidence that any party to the Policy, either Crestline or AFM, intended for every other client of Crestline to be an insured under this Policy.

---

an Iowa district court held that identical policy language "does plausibly cover [the hotel owner]" because the agreement between the insured management company and the hotel owner "plausibly demonstrate[d] [the management company]'s 'operation' of [the owner company] by managing its Properties." *Id*. But as the court in *Warehouse* acknowledged, its ruling was not comparable to the district court's ruling in *Sky Harbor* because the district court decided *Sky Harbor* at the summary-judgment stage. *Id*. (distinguishing *Sky Harbor Atlanta Northeast, LLC*, 676 F. Supp. 3d. at 1310). While it's possible that by operating the Hotel, Sky Harbor and Crestline *could* demonstrate that Crestline operated Sky Harbor, Plaintiffs make no such demonstration or even argument to that effect on appeal. To the contrary, they assert that "Crestline *need not operate Sky Harbor itself*" for Sky Harbor to be an insured. (Emphasis added).

In short, Sky Harbor and Crestline's argument that Sky Harbor is an insured under the Policy definition fails, and we affirm the district court on this issue.

### D.    Counterclaims

Finally, we consider AFM's counterclaims.  To prevail on a fraud claim in Georgia, the plaintiff must show (1) a false representation by the defendant, (2) scienter or knowledge on the defendant's part that the representation was false, (3) intent to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by the plaintiff on the misrepresentation, and (5) damages.  *Nebo Ventures, LLC v. NovaPro Risk Sols., L.P.*, 752 S.E.2d 18, 22 (Ga. Ct. App. 2013). Here, AFM points to alleged misrepresentations, concealment of documents, and generally bad behavior by Sky Harbor and Crestline during AFM's investigation of their claims.

But even construing this evidence in the light most favorable to AFM, it's not clear how AFM actually relied on any alleged misrepresentations.  AFM has not shown that its investigation would have changed had Sky Harbor and Crestline made no misrepresentations—it argues only that it would not have conducted any investigation at all.  We don't think the record bears that out.  Even omitting any alleged misrepresentations, Sky Harbor and Crestline's claims required *some* investigation.  And AFM does not argue that it can demonstrate reliance in any other way.  Because AFM cannot

establish its fraud claim, its claim for civil conspiracy fails, too.[7]  We therefore affirm the district court's grant of summary judgment on AFM's counterclaims.

We begin with the issue of what reliance means under Georgia common law.  Plaintiffs argue that if AFM did not believe any alleged misrepresentations, it cannot now claim reliance.  And to be sure, some Georgia cases speak of belief as evidence of reliance. *See, e.g.*, *Pollman v. Swan*, 723 S.E.2d 290, 292 (Ga. Ct. App. 2011) (in analyzing third-party reliance under a RICO claim, stating "[u]nless an untrue statement is believed and acted upon, it can occasion no legal injury" (citation omitted)); *Henderson v. Glen Oak, Inc.*, 346 S.E.2d 842, 844 (Ga. Ct. App. 1986), *aff'd*, 351 S.E.2d 640 (Ga. 1987) (holding that appellant failed to prove reliance where he admitted at trial that "he never relied on the alleged misrepresentations because he never believed them to be true").

But a lack of belief does not necessarily destroy reliance.  Rather, under Georgia law, "[i]nducement is the substance of reliance," not belief.  *Holmes v. Grubman*, 691 S.E.2d 196, 198 (Ga. 2010) (citation omitted).  Belief can demonstrate reliance, but it isn't a necessary component; what we really look for is justifiable action or forbearance, based on the misrepresentation.  *Id.* ("[T]he form

---

[7] Under Georgia law, AFM's civil-conspiracy claim is entirely derivative of its fraud claim. *See McIntee v. Deramus*, 722 S.E.2d 377, 379–80 (Ga. Ct. App. 2012) (recognizing that a claim for civil conspiracy requires a showing that two or more parties combined to commit a tort; the conspiracy itself does not furnish a cause of action).

of reliance—action or inaction—is not critical to the actionability of fraud." (Citation omitted)); *see also Nebo Ventures, LLC*, 752 S.E.2d at 23 (finding evidence of reliance when the plaintiff stated that he would have exercised his right to pursue an audit if he had realized that statements were misrepresentations).

In the investigation context, some Georgia courts have found that when an insurer thoroughly investigates and questions an insured's claims, it cannot show that it actually relied on the insured's representations. *Blue Cross & Blue Shield of Ga., Inc. v. Kell*, 488 S.E.2d 735, 740 (Ga. Ct. App. 1997) (holding that the insurer could not show that it justifiably relied on misrepresentations where it "extensively evaluated" the claims and engaged in extensive correspondence with the parties); *see also McEntyre v. Edwards*, 583 S.E.2d 889, 891 (Ga. Ct. App. 2003) (finding no evidence that the homeowner relied on the representations made to her by the homebuilder when she "questioned almost every action the defendants made," visited the property in question daily, took pictures of the property as damage occurred, kept a journal detailing her concerns, recorded conversations, and hired her own independent expert to monitor the property). But we do not take these cases to mean, as the district court did, that a thorough investigation for any reason forecloses a claim of fraud by the insurer. *Sky Harbor Atlanta Ne., LLC*, 676 F. Supp. 3d at 1311 (holding that because AFM "thoroughly investigated Plaintiffs' insurance claim," it could not show that it relied on Plaintiffs' misrepresentations).

For example, if a claim has no coverage on its face, the insurer will summarily deny it and not investigate. But if an insured misrepresents its claim, claiming to have coverage when there really is none, the insurer is required to conduct a good-faith investigation despite its suspicions. *See* O.C.G.A. § 33-6-34(4) (requiring an insurer to "attempt[] in good faith to effectuate prompt, fair, and equitable settlement of claims submitted in which liability has become reasonably clear"); *id.* § 33-6-34(6) (prohibiting an insurer from "[r]efusing to pay claims without conducting a reasonable investigation."). In that case, the insurer has detrimentally relied on the misrepresentations because it has conducted some investigation when, absent the misrepresentations, it would have been clear that none was required. While Georgia courts have not directly commented on this theory of reliance, they have stated that insurers can recover damages based on costly and unnecessary investigations. *See Tucker v. Colonial Ins. Co. of Cal.*, 395 S.E.2d 312, 314 (Ga. Ct. App. 1990) (holding that an insurer showed damages based on its "extensive and costly investigation").

This is exactly what AFM argues on appeal. AFM says that its extensive investigation is evidence of its reliance on Plaintiffs' erroneous claims. AFM argues that had it known the truth from the beginning—about the construction defects and the decades of previous mold and water damage—"there would have been no need for AFM to retain specialists, conduct [e]xaminations [u]nder [o]ath, or incur the expenses of a prolonged claim investigation." So the question before us on appeal, as to the issue of reliance, is whether AFM acted or refrained from acting, with respect to its

investigation of Plaintiffs' claims, in reliance on Plaintiffs' misrepresentations.

In answering this question, we first consider what AFM should have known when deciding whether to conduct an investigation, had Plaintiffs made no alleged misrepresentations and had they not concealed the various pre-sale reports and assessments. Because the district court granted Sky Harbor and Crestline summary judgment on AFM's counterclaims, we construe the evidence in the light most favorable to the nonmoving party, AFM.

Under AFM's version of events, Plaintiffs should have disclosed the pre-existing construction defects in the envelope, cladding, and other parts of the Hotel, and the known water and mold damage defects caused, such as the twenty-five rooms discovered to have mold shortly before the sale. Sky Harbor and Crestline would still have to report the rain events and resulting water intrusions observed during the Policy period, too—AFM does not argue that these events did not happen, just that resulting damage is not covered.

Second, we consider whether any investigation at all was necessary, absent Plaintiffs' alleged misrepresentations. We conclude that it was. Even construing the evidence in the light most favorable to AFM, under Georgia law, AFM could not have refused to conduct an investigation before denying Sky Harbor and Crestline's claims. Very early on in its investigation, AFM's expert attributed the damage at the Hotel to water intrusions from "rain events" that occurred "over the life of the building," which

implicitly includes the three-year Policy period. And from the beginning of their claim, Sky Harbor and Crestline attributed the damage at the Hotel to rain events that occurred during the Policy period. AFM does not dispute that rain, such as the rain events cited in all versions of the Liberty report, did not occur during the Policy period. So as Plaintiffs point out, AFM still would have been obligated to conduct a reasonable investigation into which damages, if any, were new and covered, even if it ultimately concluded that any covered damages were de minimis and fell below the Policy's deductible amounts. O.C.G.A. § 33-6-34(4), (6).

Even considering its fortuity argument, AFM does not explain how the historical information about the Hotel's condition or Sky Harbor and Crestline's knowledge of the defects would have ruled out coverage *without an investigation*. For example, AFM points to evidence that would allow a reasonable jury to conclude that Sky Harbor and Crestline were aware of delayed maintenance issues and defects in the building's envelope, roof, exterior cladding, and windows before 2015, so it knew that leaks were certain to occur. But this knowledge would not have told Sky Harbor, Crestline, or AFM *how* the damage that occurred during the Policy period happened. Plaintiffs and AFM had to *investigate* to discover that the source of the water intrusions were known defects. So even if a jury could conclude that none of the damage that occurred during the Policy period was covered because the damage did not extend from a fortuitous event, that conclusion would rest on information *gathered during a necessary investigation*. In short, some sort of

investigation was necessary, even if Sky Harbor and Crestline had divulged all they knew.

Finally, we consider whether AFM's investigation could have been reduced, as opposed to eliminated entirely. AFM argues that it would not have hired consultants, conducted a floor-by-floor inspection of the Hotel, or conducted examinations under oath if it had known everything about the Hotel's pre-existing condition from the beginning. So we consider those components of AFM's investigation and decide whether, construing the evidence in AFM's favor, they could have been eliminated or reduced.

We think not. Even construing the evidence in AFM's favor, AFM would have needed to hire consultants and conducted an inspection of the Hotel, had it known from the beginning about the defects and the pre-existing damage. AFM says it hired experts to "analyze[] the cause and origin of [Plaintiffs'] claimed damages." But even if Sky Harbor and Crestline admitted that significant damage pre-dated the Policy, AFM still would have needed to hire consultants to investigate what damage, if any, occurred during the Policy period and what the potential causes of any such damages were.

AFM also attributes its floor-by-floor inspection of the Hotel to looking for damage caused by rain. But AFM does not counter Sky Harbor and Crestline's evidence that rain events during the Policy period caused water intrusions throughout the Hotel. And it does not explain how it could have definitively ruled out the

existence of covered loss without a floor-by-floor inspection of the Hotel.

Nor do any facts suggest that AFM could have released its expert consultants before they produced their report or inspected every floor. AFM needed its expert's report to identify the likely causes of the damage, including the allegedly known defects, which it received in October 2015. But the expert report covered only "a visual . . . survey of several guest rooms and common areas on the 9th and 10th stories" and views of the exterior of the building. The report specifically disclaimed making any representations "regarding the condition of areas and details of the building that were not accessible or closely observed." Sky Harbor and Crestline alleged damages on all ten stories of the building, much of which was not visible to anyone until Sky Harbor and Crestline removed wall coverings on each floor during the renovation process. So AFM's subsequent inspections of the other floors were necessary for its investigation into any damages caused during the Policy period.

Finally, AFM says it would have cut the examinations under oath entirely, had Sky Harbor and Crestline divulged all they knew up front. AFM says that it took the examinations "because [Plaintiffs] kept shifting their stories and avoiding AFM's requests for information."

But these examinations happened *after* AFM rejected Sky Harbor and Crestline's Proofs of Loss. And AFM says that it conducted the examinations because it thought Plaintiffs' stories were inconsistent and Plaintiffs were being evasive. In other words, the

examinations were the beginning of AFM's investigation into Plaintiffs' alleged fraud, rather than the end of its good-faith investigation into Plaintiffs' claims. Under Georgia law, litigation expenses of that type are recoverable only "where other elements of damage are recoverable on the underlying claim[s]." *Davis v. Johnson*, 634 S.E.2d 108, 110 (Ga. Ct. App. 2006) (citation omitted). So if the examinations are the *only* expense AFM can point to that it would not have made absent Sky Harbor and Crestline's alleged misrepresentations, it cannot recover those expenses alone without pointing to other "elements of damage."

In conclusion, we affirm the district court's grant of summary judgment on AFM's fraud claim, and as a consequence, on its civil-conspiracy claim as well.

For the foregoing reasons, we reverse the district court's grant of summary judgment on Sky Harbor and Crestline's claims for breach of contract, declaratory judgment and bad faith, and we remand for further proceedings on those claims. We affirm the district court's holding that Sky Harbor is not an insured and its grant of summary judgment on AFM's counterclaims.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**